UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RALPH GIUGLIANO,

               Plaintiff,

   -against-

FS² CAPITAL PARTNERS, LLC,

               Defendant.
-------------------------------------------------------------x

**Memorandum of
Decision & Order**
14-cv-7240(ADS)(AKT)

**APPEARANCES:**

**Zabell & Associates, P.C.**
*Attorneys for the Plaintiff*
1 Corporate Drive, Suite 103
Bohemia, NY 11716
      By:     Saul D. Zabell, Esq., Of Counsel

**Klehr Harrison Harvey Branzburg LLP**
*Attorneys for the Defendant*
1835 Market Street, Suite 1400
Philadelphia, PA 19103
      By:     William A. Harvey, Esq.
                  Mary Ellen O'Laughlin, Esq., Of Counsel

**SPATT, District Judge:**

In this employment discrimination and retaliation case, the Defendant FS² Capital Partners, LLC (the "Defendant") moves under the provisions of Federal Rule of Civil Procedure ("FED. R. CIV. P.") 56 for an order granting summary judgment and dismissing the complaint.

For the reasons that follow, that motion is denied in its entirety.

## I.    BACKGROUND

Unless otherwise noted, the following salient facts are undisputed. They are construed in the light most favorable to the Plaintiff.

The Defendant is a registered broker-dealer, which, since at least January 2009, has been in the business of trading securities. At the time of its inception, the Defendant offered investors only

one product, namely, shares in a business development company called FS Investment Corporation ("FSIC"). The Defendant's original sales strategy involved dividing the country into six geographic territories and, as to each territory, employing an "external wholesaler" – essentially a traveling salesperson – to generate sales through financial advisors within his or her geographic area.

On August 10, 2010, at the age of 50, the Plaintiff Ralph Giugliano (the "Plaintiff") was hired by the Defendant to be the external wholesaler responsible for covering "metro New York City, Westchester County, New York, Southern Connecticut to New Haven, and Northern New Jersey," as well as certain territory in Pennsylvania.

Cosmo Smith, the Defendant's then-President, and, John Shain, the Managing Director of the Defendant's holding company, were among those who interviewed the Plaintiff for his position. At the time, Smith was approximately 40 years old, and Shain, who testified that he ultimately recommended that the Plaintiff be hired, was approximately 49.

In this lawsuit, the Plaintiff alleges that four discrete aspects of his employment were adversely affected by age discrimination on the part of the Defendant, culminating in his constructive discharge: (1) the geographic scope of his sales territory; (2) his company-imposed sales goals; (3) his access to internal support staff; and (4) his access to, and treatment at business conferences and other work-related events.

A.      **The Plaintiff's Sales Territory**

The geographic scope of the Plaintiff's sales territory, as well as other terms and conditions of his employment, were set forth in a Registered Representative Agreement, which the parties voluntarily signed prior to the Plaintiff's start date. This agreement expressly stated that the Plaintiff's sales territory was subject to change or modification in the sole discretion of the Defendant.

Consistent with this provision, it is undisputed that, at varying times throughout the Plaintiff's employment, the geographic scope of his sales territory was, in fact, altered.

From April 2011 to April 2012, Lance Murphy, then a 41-year old National Sales Manager, was responsible for making changes to the external wholesalers' sales territories. Thereafter, beginning in September 2012, Bill Wolfe, then a 42-year old Senior Vice President, and Mike Vessels, who, at 56 years old, replaced Murphy as the National Sales Manager, took over this responsibility.

It is the Plaintiff's contention that the Defendant systematically reduced his sales territory because of his age, and then reassigned his former territory to younger external wholesalers.

Consistent with this allegation, the record reflects that, at some point in 2011, the territory comprising the five boroughs of New York City were reassigned from the Plaintiff to Jared Larson, an external wholesaler who was approximately 25 years old at the time. Thereafter, in 2012, the portions of eastern Pennsylvania formerly serviced by the Plaintiff were reassigned to Marshall Birkins, who was approximately 32 years old at the time. Finally, in 2013, the northern New Jersey territory formerly serviced by the Plaintiff was also reassigned to Larson, then approximately 27.

Altogether, the Plaintiff claims, and the Defendant does not materially dispute that the geographic area comprising his sales territory was reduced by 62%.

He testified that he orally complained "at great length to numerous people," including Murphy and Wolfe, about the changes in his sales territory and his belief that he was unfairly affected by these changes due to his age. Wolfe acknowledged this, testifying that the Plaintiff complained to him "[o]n a few occasions" about having critical portions of his sales territory reassigned.

The Plaintiff also claims to have complained in early-2013 to the Defendant's Compliance Officer Adrienne Hart that he was being discriminated against on the basis of his age, as evidenced by his sales territory being reassigned to younger external wholesalers.

On the other hand, the Defendant contends that these periodic modifications in sales territory were a necessary consequence of the company's growth. Namely, the Defendant asserts

that as its product offerings increased, so too did the need for additional external wholesalers in the field selling the company's products.

Thus, the Defendant regularly "re-drew" the boundary lines of its sales territories to expand the number of individual regions that external wholesalers would be assigned to cover. However, this expansion inevitably meant that the geographic footprints of existing sales territories were reduced to make way for newly-created territories.

Similarly, as a byproduct of this growth, external wholesalers were displaced from parts of the country that had once previously come within their purview, as those areas were reassigned to other salespeople who assumed responsibility for the newly-created territories. The Defendant maintains that this reallocation occurred without regard for the ages of the salespeople involved.

Rather, the Defendant asserts, and the Plaintiff does not materially dispute that between 2009 and 2014, the number of individual sales territories increased from six to 25, and the number of external wholesalers grew to more than 30. Consequently, every external wholesaler who was employed by the Defendant during this time, including the Plaintiff, saw the geographic scope of his or her sales territory reduced. In this regard, in its statement of undisputed material facts, the Defendant identified 22 external wholesalers whose sales territories were reduced between 2011 and 2014, some older and some younger than the Plaintiff.

The Plaintiff does not dispute that these other external wholesalers also saw the geographic scope of their sales territories decrease during his employment. Nor does he dispute that four of these individuals are older than he is, and half are over the age of 40. Rather, he asserts that his sales territory was reduced the most.

B.      The Plaintiff's Sales Goals

Other than a general description of relevant job responsibilities contained in the Plaintiff's employment agreement, there is no evidence that the Defendant established any formal sales goals for external wholesalers in 2010, when the Plaintiff commenced his employment.

However, from 2011 to 2013, Murphy, then in his early 40s, was responsible for setting the wholesalers' sales targets. From 2013 to 2014, Vessels, then approximately 57 or 58 years old assumed that responsibility. Also, beginning in 2012, when Bill Wolfe, then 42, became the Plaintiff's direct supervisor, he was involved in setting the Plaintiff's sales goals.

In this regard, it is undisputed that, as the geographic area comprising the Plaintiff's sales territory decreased, the sales goals established for him by the Defendant periodically increased.

Again, the Plaintiff alleges that this situation was engendered by age discrimination. In particular, he suggests that increasing his sales goals to "unachievable" levels, while simultaneously diminishing the available territory in which to effectuate those sales, effectively set him up to fail – a pretext for a discriminatory employment action.

Other than the Plaintiff's own deposition testimony describing his increased sales goals as "unachievable," the record does not establish what the Plaintiff's sales goals were in any given year. However, the Plaintiff asserts, and the Defendant does not materially dispute that during the same period of time that his sales territory decreased by 62%, his sales goals increased by 40%.

Several current and former management-level employees of the Defendant testified in depositions that a reduction in the geographic footprint of a sales territory did not necessarily translate into a reduction in the number of potential clients within that territory. Nor, therefore, would a reduction in geographic area be expected to result in a corresponding reduction in an external wholesaler's sales volume.

On the contrary, Murphy testified that when an external wholesaler's geographic sales area was reduced, he or she was expected to develop a greater density of clients within their remaining territory – a concept called "penetration." According to Murphy, data showed that the opportunity to penetrate a given territory is not necessarily greater in a larger geographical area; rather, a salesperson can accomplish more when the amount of time he or she spends traveling between far-flung clients is minimized.

Further, to the extent that reconfiguring the sales territories *could* be expected to negatively impact an external wholesaler's sales production, these deficits were thought to be supplemented by so-called "exceptions."

In particular, cognizant that sometimes the reconfiguration would divest an external wholesaler of a valuable client relationship that he or she spent considerable time and resources establishing, the Defendant occasionally granted "exceptions," which allowed an external wholesaler to continue servicing a client (and earning the associated commissions) despite the fact that the client no longer came within the wholesaler's territorial boundaries.

The Plaintiff does not dispute that, as his sales territory changed, the Defendant granted him 49 exceptions, so that he could continue servicing clients outside of his modified sales territory, including in New York City. Nor does the Plaintiff dispute that he was given the most exceptions of any external wholesaler whose sales territory was changed. Rather, he asserts that he requested more exceptions than this to compensate for the reductions in his sales territory, some of which were denied.

On this subject, Brian Boulerice, the Defendant's 38-year old Vice President of Business Development, testified that a simultaneous reduction in sales territory and increase in productivity goals was implemented company-wide. In this regard, Boulerice stated that the Plaintiff's individual sales goal would have been determined based on the firm's overall goals – a proposition the Plaintiff does not materially dispute, other than to suggest that he was more heavily impacted than the other external wholesalers.

Similarly, Wolfe testified that the same process used to determine the Plaintiff's annual sales goals was used for every other external wholesaler, taking into account the company's overall goals and the unique composition of territories; not the salesperson's age. Murphy noted that additional evaluative factors included the amount of potential clients within a given sales territory; the wholesaler's penetration rate within the territory; and the wholesalers' prior years' sales.

Consistent with Boulerice and Wolfe, Murphy testified that, although he was unfamiliar with any of the Plaintiff's specific sales goals, they would have been based on the company's overall productivity. For example, he testified that in 2012, the firm as a whole exceeded its sales targets. Therefore, the Defendant raised the individual goal for each external wholesaler, even as the company reduced the geographic scope of their territories to permit expansion. In this regard, Murphy testified that the Plaintiff's estimate of a 40% increase in his sales goal was plausible, given the company's rapid growth during the relevant time period. To illustrate, he explained that from 2009 to 2011, the Defendant had generated just $500 Million in total sales. However, by 2012, it was generating $150 Million a month.

C.     **Plaintiff's Access to Internal Support Staff**

Further, the Plaintiff alleges that his plight was worsened by the fact that he was "stripped" of a support staff.

In this regard, the deposition testimony showed that the Defendant's sales organization featured two types of salespeople, namely, internal wholesalers (also called internal sales consultants) and external wholesalers. As their respective titles suggest, the main difference between these positions is where they operate – an external wholesaler works in the field, engaging in off-site sales efforts, while an internal wholesaler works in the company's home office, engaging in mostly over-the-phone sales efforts. Murphy testified that internal wholesalers do not report to external wholesalers; rather, they are part of a common sales team.

In addition to internal wholesalers and external wholesalers, the sales team also included sales associates, whose role was to provide inter-departmental support, sometimes assisting up to four external wholesalers at a time.

In this regard, the Plaintiff concedes that virtually every external wholesaler went some period of time without one-on-one internal support. However, he contends that external wholesalers traditionally were not expected to go more than a quarter without a dedicated internal

wholesaler.  He alleges that he was the only external wholesaler to go approximately 11 months without full-time help – a condition that exacerbated the already-untenable situation caused by a simultaneous increase in sales goals and decrease in sales territory.

In this regard, although the Plaintiff disputes whether they were singularly assigned to him, it appears to be undisputed that, in 2010 and 2011, he received sales support from internal wholesalers named Karin Sheehy, Shaun Adams, and Ryan Flynn.

Further, the Plaintiff alleges, and the documentary evidence appears to establish that, on December 3, 2012, Andrew Kennedy was hired to work specifically with the Plaintiff as an internal wholesaler.  Although Murphy testified that it was always possible for Kennedy's assignment to change based on the needs of the company, the Plaintiff points out that in July 2013 Kennedy was reassigned to work for Birkins, the wholesaler who, at 20 years his junior, was given responsibility for portions of the Plaintiff's former sales territory in Pennsylvania.

It is undisputed that, between July 2013 and June 2014, a replacement for Kennedy was never assigned to the Plaintiff – this despite his repeated requests for a dedicated support staffer, and notwithstanding the Defendant concededly hiring ten new internal wholesalers and eight new sales associates between 2013 and 2014.  The apparent contradiction notwithstanding, the Defendant maintains that a full-time replacement was not provided to the Plaintiff because the company lacked sufficient internal support staff.

Further, during this period, the Plaintiff alleges, and the Defendant appears to concede that younger external wholesalers were assigned dedicated internal support staff, while the Plaintiff was not.  In fact, the Defendant admits that in 2013 and 2014, while the Plaintiff was without dedicated internal support, no less than nine individuals under the age of 40 had a specifically-assigned internal wholesaler assisting them.

There is testimonial and documentary evidence demonstrating that the Plaintiff repeatedly complained to his superiors about this situation.  Wolfe, the Plaintiff's direct supervisor, testified

that the Plaintiff complained "often" that he was not receiving adequate levels of internal support. This is corroborated by an April 18, 2014 e-mail, in which the Plaintiff notified Wolfe that he had been without internal support for eight months. Murphy also testified that he can recall at least one telephone conversation in which the Plaintiff complained about not receiving adequate internal support.

In this regard, it appears to be true that the Plaintiff was not the only external wholesaler to go more than a quarter without a dedicated internal wholesaler. Rather, upon being promoted to external wholesaler at the age of 26, Jared Larson went without internal sales support from November 2012 until July 2013, a period of eight months, when he began sharing the services of Daniel O'Donnell with another salesperson.

Nevertheless, the Plaintiff attributes his lack of internal support to age-based discrimination and, as discussed more fully below, retaliation for lodging related complaints to management.

In fact, the Plaintiff testified that, during a September 2013 golf game, he asked Bill Wolfe whether the firm's failure to provide him with internal sales support was related to his repeated informal complaints. Wolfe allegedly responded "it would be naïve for [the Plaintiff] to think that's not the case."

According to the Plaintiff, he followed up on this issue in January 2014, at which time Wolfe allegedly advised the Plaintiff for a second time that the Defendant was withholding internal support as punishment for lodging complaints against the company.

The Plaintiff also testified that, in March 2014, he followed up with Shaun Adams, the Director of Internal Sales, regarding the status of the company's search for a replacement for Kennedy. According to the Plaintiff's account, Adams commented that the Plaintiff was "in the penalty box" – a statement the Plaintiff understood to be a reference to his complaints of unfair treatment.

On the other hand, the Defendant contends that dedicated internal support was a privilege, not a right, and that every external wholesaler went some period of time without a full-time internal wholesaler assisting them. In this regard, Murphy testified that, although internal wholesalers and sales associates sometimes worked exclusively with a particular external wholesaler, externals were not entitled to a dedicated support staff. On the contrary, internal wholesalers and sales associates were employees with independent sales responsibilities, who were assigned to service a given territory, not to assist a particular external wholesaler.

In this way, the Defendant asserts, and the Plaintiff does not entirely deny that *some* form of internal support was always available to external wholesalers, including the Plaintiff, even if not in the form of one-on-one assistance. Indeed, the Plaintiff conceded that, although he went without a dedicated support staffer from July 2013 to June 2014 – according to him, the longest of any external wholesaler – during this time, he was nevertheless able to obtain general company support in the form of a "floating" internal wholesaler, namely, Peter Light, whose services he shared with other salespeople, and scheduling assistance from the administrative staff.

Further, Murphy testified that the Defendant utilized a rigorous evaluation process for prospective internal wholesalers and sales associates. According to Murphy, the lengthy hiring process "handicapped" the firm's ability to make new hires as quickly as was demanded by its expansion, and that the Defendant did its best to move around resources to satisfy the needs of all of its external wholesalers.

Thus, as noted above, while the Defendant attempted to fill vacancies in its ranks, external wholesalers, including the Plaintiff, were expected to go as long as necessary without full-time support.

D.     **The Plaintiff's Access to Work-Related Events**

Finally, the Plaintiff contends that, as a result of the Defendant's age discrimination, he experienced social isolation and exclusion from work-related events, which impeded his ability to generate new business opportunities and maintain existing client relationships.

In this regard, the Court notes that, although the complaint alleges that the Defendant prevented the Plaintiff from attending no less than seven off-site conferences, the Plaintiff was unable at his deposition to identify these seven events, and the record does not otherwise support that figure.

More accurately, the record shows that, throughout his employment, the Plaintiff attended many conferences and, for varying reasons, did not attend others.

For example, it appears that the Plaintiff deliberately chose not to attend certain conferences.  In this regard, he testified at his deposition that he viewed some conferences as mandatory and others as optional, based on the likelihood of client exposure and business opportunities, relative to the cost of attendance.  Indeed, when external wholesalers *did* attend a conference, the associated costs were deducted from their individual budgets, which necessarily reduced the funds that were available for that person to attend other work-related functions.

In this regard, the Plaintiff does not deny writing an e-mail to Wolfe in May 2013, expressing concern over the deleterious effect that his attendance at off-site conferences was having on his yearly budget.  Specifically, be lamented that the Defendant had requested his attendance at what would have been his third conference in three weeks, and his sixth in the first five months of the year.

Nor does the Plaintiff materially dispute that in early-2014, at Wolfe's direction, he coordinated with Boulerice and the Defendant's Business Development Group to schedule several off-site conferences.  It warrants noting that these conferences were held in April 2014, *after* the Plaintiff filed a charge of discrimination with the EEOC.

In other situations, the Defendant's management team was responsible for assigning external wholesalers to attend conferences. In this regard, it is undisputed that every external wholesaler was not needed at every conference; and, depending on the location and purpose of a given conference, the firm could predict which regional wholesalers would likely benefit from attending. Thus, although the Defendant denies that the Plaintiff was categorically barred from attending off-site conferences, it does concede that management simply did not select him to attend all of them.

For example, in their depositions, both Wolfe and Boulerice noted their opinion that the Plaintiff lacked effective public speaking skills. Thus, Wolfe explained that, if attendance at a given conference required someone to give a presentation on behalf of the company, the Plaintiff likely would not be the Defendant's chosen representative.

In any event, the record contains evidence pertaining to three work-related events: (1) the Commonwealth 2013 President's Club Meeting; (2) an April 16, 2014 event commemorating the listing on the New York Stock Exchange of one of the Defendant's funds; and (3) a June 2014 meeting at Bill Wolfe's home.

The first of these relates to an event in Utah sponsored by Commonwealth, a national broker-dealer with home offices in San Diego and Boston. E-mail correspondence introduced at the deposition of Boulerice appears to show that, when attempting to staff this event, management removed the Plaintiff from consideration. In this regard, Boulerice testified that, based on the location of the event; the number and composition of clients likely to be in attendance; and the amount of sales generated by the various external wholesalers in that territory, the conference should be attended by John Cardillo, then 41 years old, whose territory included Boston; who ranked first in sales; and who was likely to have four times the amount of Commonwealth clients in attendance than the next closest salesperson.

However, there was another vacant seat at this conference, which the Plaintiff apparently felt he should have been selected to fill based on the fact that he also ranked in the top 10 in sales to Commonwealth, and his sales territory included the fifth-most Commonwealth representatives.

At his deposition, Boulerice disputed that these were sufficient reasons to justify the Plaintiff's attendance, testifying that the Plaintiff's Commonwealth-heavy clientele did not provide a reliable indicator of how many of these metro New York-based clients would likely attend the conference in Utah. As to the Plaintiff's contention that Boulerice acted with a discriminatory and/or retaliatory motive, it is noted that, in the same e-mail, he similarly recommended that Larson, who is younger than the Plaintiff, also not attend the Utah conference, and that Stephanie Reed, who is older than the Plaintiff, attend because she "does a great job at conferences."

The second "event" was actually a series of coordinated events commemorating the first ever listing on the New York Stock Exchange of one of the Defendant's funds, namely, FSIC. The arrangements included a formal ceremony in New York, at which a select group of employees toured the stock exchange and rang the opening bell, and breakfast gatherings and after-work receptions for employees in Philadelphia and Orlando.

In this regard, in an April 9, 2014 e-mail to all company personnel, Michael Forman, the Defendant's Chairman and CEO, stated that

> It's hard to believe but the listing of FSIC is less than a week away. As many of you know, we have planned some events in New York around the listing.
>
> Although I wish you could all be there with us, space and other constraints prohibited us from including everyone.
>
> We will be hosting breakfast gatherings in both Philadelphia and Orlando so you can all watch the bell ringing together as well as post work parties in both cities so you can celebrate our first day of trading.
>
> While we all can't be celebrating together, we will be celebrating together in spirit.

*See* Tr. of Pl. Dep., DE [77-1], at 206-07.

The Plaintiff apparently believed that he should have been selected to attend the official New York ceremony because, although New York City no longer came within his Sales Territory, he continued servicing "exceptions" in that area. And, he claims to have been responsible for raising a substantial portion of FSIC's assets.

Thus, after receiving Forman's e-mail, the Plaintiff asked Wolfe if he could attend the New York event, to which Wolfe replied in a "short, curt" way that the Plaintiff "would not be attending that listing" – a response the Plaintiff contends was retaliatory for his having filed an EEOC charge the month before.

Slighted, the Plaintiff also declined to attend the related events in Philadelphia and Orlando.

In this regard, consistent with Forman's reference to "space and other constraints," Murphy and Wolfe both testified that only a limited number of people were selected to attend the official ceremony at the Stock Exchange, and thus implicitly denied any nefarious motive for the Plaintiff's omission from the guest list. In fact, Wolfe, a management-level employee, was also not invited to the official ceremony, while Stephanie Reed, then age 55, Dan Church, then age 50, and Corey Calvert, then age 47, all attended.

Finally, the Court notes that there was relevant deposition testimony regarding the Plaintiff's feelings of alienation at a meeting held at Bill Wolfe's home in June 2014. In particular, the Plaintiff described an event at which he overheard Murphy direct Shaun Adams and Ryan Flynn not to sit with the Plaintiff. He testified that Murphy was "eyeballing anybody who would talk to" the Plaintiff and would approach those people to ask why they were speaking to him.

When confronted about this conduct Murphy allegedly become infuriated, requiring the intervention of John Shain.

The Plaintiff contends that Murphy's conduct on this occasion was retaliation for his having filed an EEOC charge against the Defendant.

E.      **The Evidence of Ageist Remarks**

To support his theory that the Defendant's conduct was motivated by age-based discriminatory animus, the Plaintiff refers to several allegedly discriminatory comments made by management-level employees.

1.      **Lance Murphy**

As noted above, Murphy was the Defendant's National Sales Manager, who, from April 2011 to April 2012, was responsible for determining the external wholesalers' sales territories, and from 2011 to 2013, was responsible for setting their sales targets.

At a company-wide year-end meeting in 2011, Murphy, then age 41, is alleged to have made an ageist remark about the Plaintiff.  Namely, Murphy allegedly delivered a slide presentation entitled "Top Ten Observations from 2011."  One slide featured a photograph of an unknown person's smiling mouth and stated "Need dental work? Ralph's got a guy."  The Plaintiff concedes that the image shown was not of him.  Nor does he apparently contend that there is anything inherently ageist about the remark "Ralph's got a guy" (although he suggested during his deposition that this remark may be derogatory against Italian-Americans).

Rather, the Plaintiff contends that this slide was accompanied by an offensive verbal comment, in which Murphy stated, "When you get old, you've got to get new teeth," or words to that effect.

The Plaintiff claims to have complained to Murphy the following day, advising him that he did not appreciate the reference to his age, to which Murphy allegedly responded by telling the Plaintiff to "lighten up."  The Plaintiff also claims to have complained orally to John Shain.

For his part, Murphy denied giving this presentation at all, let alone making the ageist remark.  Rather, at his deposition, he testified that it was Boulerice who delivered the "Top Ten" presentation, which was modeled after David Letterman's famous comedy routine, and was given annually at the Defendant's year-end event.  According to Murphy, the "Top Ten" list was a "moment

of levity" at the meeting "that was designed to poke fun at each other and have a sense of humor and a little fun."

In fact, the Plaintiff conceded during his deposition that management-level employees, including Stephen Sypherd (Defendant's General Counsel) and Forman (Chairman and CEO), were also the subject of jokes during this presentation. Murphy testified that he has been the subject of jokes during "Top Ten" lists in prior years, and that the Plaintiff actually participated in crafting jokes about other employees that would be featured in similar presentations.

Apart from this, the Plaintiff attributes several other ageist remarks to Murphy.

For example, at the 2012 year-end meeting, which was actually held in January 2013, Murphy, then approximately 42 years old, allegedly stated to the Plaintiff, "Ralph, isn't it getting past your bedtime? It's very late for a person your age to be out this late, I need you sharp for the meeting for tomorrow."

Further, in an unspecified 2013 meeting, with regard to the Plaintiff's difficulty using technology, Murphy, then 43, allegedly stated that "[you] can't teach old dogs new tricks."

At another unspecified meeting in 2013, Murphy allegedly stated, "Ralph wholesaler is a dinosaur era, too old for today's wholesaler," or words to that effect.

Also, at the 2013 year-end meeting, which was held in January 2014, Murphy, then 44, allegedly told the Plaintiff, "Ralph, you are going to boot camp because you are old and can't keep up with the younger co-workers." At this same event, with regard to a coat the Plaintiff wore, Murphy also allegedly stated, "Why are you wearing that outfit, you look like you're back in the 70s."

Murphy denied making these remarks. And, except for the remark about teaching "old dogs new tricks," which the Plaintiff claims to have reported to Adrienne Hart, the Defendant's Compliance Officer, he conceded that he did not report these comments to anyone at the company.

### 2.    Bill Wolfe

At his deposition in this case, the Plaintiff also attributed ageist remarks to Wolfe, his direct supervisor from 2012 to 2014, although none are specifically pled in the complaint.

Namely, during a telephone conversation in July 2013, Wolfe, then approximately 43 years old, allegedly advised the Plaintiff that he "need[s] to keep up in modern day wholesal[ing]" and that his "tech skills are old."  The Plaintiff claims to have asked Wolfe for examples, but received none.

Also, in September 2013, while the two men played golf together at the North Hempstead Country Club, in the context of using technology in wholesaling, Wolfe allegedly stated that the Plaintiff, "is like back in 2000" and "[is] fighting father time."

Curiously, Wolfe was not specifically questioned about these alleged remarks during his deposition, and therefore did not specifically deny or explain them.

For his part, the Plaintiff conceded that he did not complain to anyone at the company about these remarks.

### 3.    Brian Boulerice

Although Boulerice was considered "senior management," he was at no time the Plaintiff's supervisor. Rather, Boulerice testified that the majority of his interactions with the Plaintiff were personal in nature and revolved around the pair's shared interests, including Florida, golf, horses, and poker.  In this regard, Boulerice testified that had been an invited guest at the Plaintiff's property in Florida; that he was introduced to members of the Plaintiff's family; and that he joined the Plaintiff for rounds of golf at his country club.  On a professional level, the two attended client meetings and conferences together.

In addition to the incident described above, in which Boulerice in 2011 supposedly referenced the Plaintiff's teeth during the "Top Ten" presentation, the Plaintiff attributes the following ageist remarks to him.

At an unspecified time, Boulerice allegedly stated that management felt the Plaintiff was "not scalable." The timing of this remark is unclear – the Plaintiff testified at his deposition that it occurred in April 2011, while his amended EEOC Charge alleged that it occurred in January 2013.

There also seems to be general confusion regarding the meaning of the term "scalable" in the context alleged. Namely, at the time the remark was supposedly made, Plaintiff testified that he asked Boulerice for the meaning of "scalable," to which Boulerice responded "the ability to go forward." At his deposition, Boulerice not only denied making this statement, but denied knowing what the word "scalable" means as it relates to a person.

John Shain also testified that, as it relates to a business, "scalable" generally denotes the ability to grow and remain profitable. But he denied ever hearing the term used with regard to a person, and does not know what it might mean in that context.

When asked about this remark, Murphy simply stated, "That sentence doesn't even make any sense."

Further, the Plaintiff alleges that, in December 2013, Boulerice, then approximately 35 years old, referred to him as the "oldest wholesaler." However, Boulerice denied ever making this remark.

4.      **John Shain**

Lastly, the Plaintiff alleges that, throughout this employment, John Shain, the Managing Director of the Defendant's holding company, who was initially involved in hiring the Plaintiff, made several ageist remarks directed at him.

First, at a 2012 meeting at the Ritz Carlton Hotel in Orlando, Shain, then approximately 51 years old, allegedly commented on the Plaintiff's attire by stating, "Ralph, you're too old to wear that shirt." He then pointed to Mike Mailey, an internal wholesaler who is 23 years younger than the Plaintiff, and stated "that is the type of clothing you should be wearing," or words to that effect.

Further, at a December 2013 meeting, Shain, then 52, allegedly stated that, although the Plaintiff's "teeth are still white," his hair was "much grayer than the last time" they saw one another. He also stated, "As a matter of fact, I think you are one of the oldest Franklin Square employees."

Finally, the Plaintiff alleges that on "numerous occasions" Shain made ageist remarks regarding the Plaintiff's preference for drinking red wine, rather than shots of liquor. On these occasions, which are neither specifically identified in the complaint nor established with any level of detail in the record, Shain allegedly stated that red wine is "an old man's drink."

Shain denied making these remarks, and the Plaintiff conceded that he did not report them to anyone at the company.

F.    **The Termination of the Plaintiff's Employment**

By letter dated February 3, 2014, attorney Saul D. Zabell, Esq. advised Wolfe that he had been retained as counsel for the Plaintiff in connection with alleged acts of unlawful age-based discrimination. The ostensible purpose of counsel's letter was to negotiate a resolution of the matter without the need for a legal action. It is not clear from the current record whether the Defendant ever responded.

However, on March 27, 2014, the Plaintiff filed with the EEOC a charge of age discrimination against the Defendant.

On April 16, 2014, while still employed by the Defendant, the Plaintiff contacted John Norris, a Vice President and National Sales Director of Dividend Capital, another broker-dealer, and inquired about a potential employment opportunity there. According to the Plaintiff, he was exploring alternative employment to escape the Defendant's abusive working conditions.

On April 28, 2014, the Plaintiff filed with the EEOC an amended charge of discrimination. In a supporting affidavit, the Plaintiff chronicled substantially the same accusations outlined above.

On May 30, 2014, following a series of initial meetings, Dividend Capital offered the Plaintiff a position as an external wholesaler with responsibility for the entire State of New York. The Plaintiff accepted this offer on June 1, 2014.

To formalize his acceptance, the Plaintiff signed the May 30, 2014 offer letter; signed a so-called Commissions Payable Letter; and completed an Application for Employment, in which he reported that his reasons for leaving the Defendant's employ included a reduction in his sales territory and reduced commissions. He conceded that he did not inform Dividend Capital that he believed he was the subject of unlawful discrimination and/or retaliation.

On June 10, 2014, the Plaintiff sent an e-mail to Bill Wolfe "memorializ[ing] [his] constructive discharge." In particular, referring to substantially the same relevant events outlined above and in his amended EEOC charge, the Plaintiff noted his belief that the Defendant "ha[d] no intention of stopping [its] unlawful campaign of harassment and discrimination," which, "[d]espite [his] best efforts," the Plaintiff "[could] no longer tolerate."

The Plaintiff commenced his employment at Dividend Capital the following day, on June 11, 2014.

In September 2014, the Defendant divided the Plaintiff's former sales territory between George Loures and Aaron Bateman. Loures, then approximately 54 years old, assumed approximately 80% of the Plaintiff's former geographic footprint in metropolitan New York and Westchester, while Bateman, then 37, assumed the remaining 20% in and around Albany.

On October 23, 2014, the EEOC issued to the Plaintiff a Notice of Right to Sue.

This action followed.

## II.    DISCUSSION

### A.    The Standard of Review

Under FED. R. CIV. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.' " *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

" '[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

**B.    The Plaintiff's Claims of Age Discrimination**

The Plaintiff brings claims of age discrimination under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

For the reasons that follow, the Defendant's motion for summary judgment dismissing these claims is denied.

**1.    The Applicable Legal Framework**

At the summary judgment stage, the Plaintiff's federal, state, and local discrimination claims are evaluated using a common analytical framework, namely, the burden-shifting test announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 96, 106-07 (2d Cir. 2010) (applying *McDonell-Douglas* to ADEA claims); *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198-99 (2d Cir. 1999) (same); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.1 (2d Cir. 2009) (applying same analysis to claims under the NYSHRL and NYCHRL); *Abdus-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (same).

At the outset, the Court notes that the Plaintiff disputes whether the *McDonnell Douglas* analysis applies to his claims. Rather, he contends that, since he has proffered direct evidence of discrimination, the *McDonnell Douglas* framework does not apply. The Court disagrees.

It is true, as the Plaintiff suggests, that "[w]here a case of discrimination is made out by direct evidence, reliance on the [*McDonell Douglas*] test developed for circumstantial evidence is obviously unnecessary." *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (noting that "the *McDonnell Douglas* framework does not apply, where, for example, a plaintiff is able to produce direct evidence of discrimination").

However, "[t]o avoid the burden-shifting analysis, 'the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support [his] allegations of discriminatory treatment.' " *Keith Short & Fair Hous. Justice Cntr. v. Manhattan Apts., Inc.*, 916 F. Supp. 2d 375, 396 (S.D.N.Y. 2012) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 61 (2d Cir. 1997)). Short of a bare admission, this requires proof of "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the [employer's] alleged discriminatory attitude." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997).

In the Court's view, no such evidence is presented here. On the contrary, the Plaintiff's case is built upon circumstantial and highly disputed evidence that, while arguably enough to create an issue of fact for trial, is not sufficiently probative of intentional discrimination to "leapfrog all three components of the *McDonnell Douglas* test." *Zebedeo v. Martin E. Segal Co.*, 582 F. Supp. 1394, 1412 n.7 (D. Conn. 1984). Accordingly, the Plaintiff's request to dispense with the *McDonnell Douglas* framework on the ground that he has proffered direct evidence of discrimination is denied.

Returning to the issue at hand, under the *McDonnell Douglas* standard, the Plaintiff is first required to establish a *prima facie* case of age discrimination. This involves demonstrating "four

things: (1) he is a member of the protected class; (2) he is qualified for his position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of age discrimination." *Id.*

"If the plaintiff meets the minimal burden of establishing a *prima facie* case, the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 739 (2d Cir. 2014).

The Defendant's burden at this stage has been described as "light," and the employer is required to "simply articulate an explanation that, if true, would connote lawful behavior.' " *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 176 (E.D.N.Y. 2011) (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998)); *see Sethi v. Narod*, 12 F. Supp. 3d 505, 522 (E.D.N.Y. 2014) (noting that a defendant's burden at this stage "is not a particularly steep hurdle"; it is "one of production, not persuasion" and "can involve no credibility assessment" (internal citations omitted)).

Finally, "[i]f the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the *prima facie* case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's [age] was." *Welsey-Dickson*, 973 F. Supp. 2d at 397; *see James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (noting that "once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination").

The Plaintiff can "satisf[y] this burden by presenting facts, which 'taken in [his] favor, suffice to . . . [show that] a triable issue [exists] as to whether [his] age was a 'but for' cause of [his] termination." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (quoting *Gorzynski*,

596 F.3d at 106) (quoting, in turn, *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 180, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)).

2.     Application to the Facts of this Case

a.     *Prima Facie* Case of Discrimination

The parties do not dispute the first two elements of the Plaintiff's *prima facie* case, namely, that he is a member of the protected class (*i.e.*, over the age of 40), and was qualified for his position with the Defendant. However, the Defendant contends that the Plaintiff has not established that he suffered an adverse employment action or that the circumstances surrounding his separation from the company give rise to an inference of discrimination.

i.     Adverse Employment Action

First, the Defendant contends that the Plaintiff failed to adduce sufficient evidence of a constructive discharge to justify presenting that question to a jury. The Court disagrees.

(A)     The Applicable Legal Principles

An adverse employment action "is more disruptive than a mere inconvenience or an alteration of job responsibilities and can include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices . . . unique to a particular situation." *Leibowitz*, 584 F.3d at 499 (internal quotation marks and citation omitted).

One form of adverse employment action is a constructive discharge, which " 'occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.' " *Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F3d 81, 89 (2d Cir. 1996)).

" '[A] constructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer. Nor is the test merely whether

the employee's working conditions were difficult or unpleasant.' " *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) (Spatt, *J.*) (quoting *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)).

Rather, "[a] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Stetson v. NYNEX Serv. Co.*, 95 F.2d 355, 361 (2d Cir. 1993) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)) (quoting, in turn, *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)).

In applying these standards, the Second Circuit has instructed that "the effect of a number of adverse conditions in the workplace is cumulative . . . [b]ecause a reasonable person encounters life's circumstances cumulatively, and not individually." *Chertkova*, 92 F3d at 90.

### (B)      Application to the Facts of this Case

Viewing the record in the light most favorable to the Plaintiff, the Court finds that questions of fact precluding summary judgment exist with regard to whether he was subjected to materially adverse employment actions.

In particular, there are five main aspects of the Plaintiff's employment that he contends combined to create working conditions so intolerable that he was effectively forced to resign: (1) periodic reductions in the geographic scope of his sales territory; (2) periodic increases in his sales goals; (3) the removal and failure to replace his dedicated support staff; (4) exclusion from and/or isolation at work-related events; and (5) ageist remarks by members of senior management.

Most of these circumstances are undisputed. For example, the Defendant concedes that the geographic scope of the Plaintiff's sales territory was periodically reduced, often while the expectations placed on his ability to effectuate sales increased. In this regard, there is little evidence

pertaining to the actual effect that these circumstances had on the Plaintiff's ability to perform his job, and the Defendant's witnesses testified that, in general, reducing a salesperson's geographic footprint would not necessarily impede his or her selling capacity.

However, the Court finds that, contrary to the Defendant's position, it is reasonable to infer that a reduction in the geographic scope of the Plaintiff's sales territory could deprive him of opportunities to service potentially valuable clients that formerly came within his purview. In the Court's view, it is for a jury to decide whether the Plaintiff suffered a materially adverse employment action when certain portions of his former sales territory were reassigned to other individuals, who ultimately earned commissions on sales in those regions.

Further, the Defendant also concedes that, from July 2013 until the time the Plaintiff resigned, he was not specifically assigned an internal wholesaler or dedicated sales associate – a condition that Bill Wolfe, the Plaintiff's direct supervisor, conceded would impact an external wholesaler's ability to effectively perform his or her job.

Again, the record is somewhat lacking in proof of an actual material loss that the Plaintiff suffered as a consequence of this change in staffing. However, as noted, Wolfe's testimony can reasonably be construed as indicating that such a loss is possible, if not likely, when an external wholesaler is deprived of internal sales support.

In this regard, consistent with the Plaintiff's position, the record shows that, with extremely limited exceptions, external wholesalers were not expected to go as long as he did without a dedicated internal wholesaler. Although the Defendant was able to reference other external wholesalers who also purportedly went lengthy periods of time without internal support, this fact is not dispositive of whether, as it relates to the Plaintiff, the Defendant's decision not to assign him internal support constituted an adverse employment action.

This is particularly true given the uncontroverted evidence that Andrew Kennedy *was* specifically hired to work for the Plaintiff, but was reassigned to a younger salesperson and never

replaced. In this regard, there is evidence to contradict the Defendant's explanation that a full-time replacement was not provided to the Plaintiff because the company lacked sufficient internal support staff, and in any event, the Plaintiff testified that Wolfe privately acknowledged that the company's decision not to assign him internal help was punishment for his repeated complaints to management. In the Court's view, a reasonable juror could conclude that these circumstances constitute an unlawful deprivation of a material benefit

The Court reaches a similar conclusion with regard to the Plaintiff's claims of being excluded from the Commonwealth conference in Utah and the listing event in New York, as well as his feelings of social isolation at a company meeting at Bill Wolfe's home.

It is undisputed that industry conferences were an important tool in an external wholesaler's repertoire, and that, if unable to attend, a wholesaler could miss out on valuable opportunities to generate new business and/or nurture existing client relationships. Drawing all inferences in the Plaintiff's favor, the Court finds that a rational juror could logically conclude that the Plaintiff's exclusion from such events "deprive[d] or tend[ed] to deprive [him] of employment opportunities or otherwise adversely affect his status as an employee." 29 U.S.C. § 623(a)(1)-(2) (emphasis supplied).

Further, while perhaps insufficient by itself to constitute an adverse employment action, the Court finds that, in the broader context of the Plaintiff's alleged working conditions, his feelings of social isolation at Wolfe's home, amplified by Murphy's alleged directives that coworkers shun him, also contribute to the factual dispute surrounding the reasonableness of his resignation. *See Flowers v. N. Middlesex YMCA*, No. 15-cv-705, 2016 U.S. Dist. LEXIS 31469, at *27-*28 (D. Conn. Mar. 11, 2016) (finding, in the context of a retaliation claim, that social isolation may be sufficient to constitute a materially adverse employment action).

Finally, the Court turns to the alleged ageist remarks directed at him by members of the Defendant's senior management. In evaluating these remarks, the Court considers "(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was

made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 349 (2d Cir. 2010).

Although totally denying these comments, the Defendant argues that they nevertheless constitute mere stray remarks, which, even if said, are insufficient to defeat summary judgment. The Court does not share this view.

On the contrary, the ageist comments described by the Plaintiff were allegedly made by the same individuals, namely, Murphy and Wolfe, who indisputably exercised control and decision-making authority over the other complained-of employment actions. These actions included reducing and reallocating the Plaintiff's sales territory; setting his sales targets; assigning or not assigning him internal sales support; choosing whether to designate him for attendance at conferences; and, in the case of Murphy, directing employees to alienate the Plaintiff at meetings.

Other comments were allegedly made by Shain and Boulerice, who, while not directly responsible for supervising the Plaintiff, were nonetheless considered senior management and involved in high-level decision-making on the behalf of the company.

Further, at least some of these comments were allegedly made in the context of critiquing the Plaintiff's job performance. These include Murphy's comment regarding the Plaintiff's ineptitude for new technology, namely, "[you] can't teach old dogs new tricks," and Wolfe's comment, allegedly made under similar circumstances, that the Plaintiff "need[s] to keep up in modern day wholesal[ing]" and that his "tech skills are old." Other comments apparently also touched on the Plaintiff's age relative to the other external wholesalers, including Murphy's remarks that the Plaintiff was "too old for today's wholesaler," and that he is "old and can't keep up with the younger co-workers."

The Court finds that these remarks may suggest an age-based bias, and that, taken in the broader context of the Plaintiff's work experience, a rational juror could so conclude. *See Abdus-Brisson*, 239 F.3d at 468 ("While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, we have held that when other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance") (internal quotation marks and citations omitted).

In sum, for purposes of this motion, the Court is unable to say that the cumulative effect of these circumstances is insufficient, as a matter of law, to establish a constructive discharge. Accordingly, the Court finds that the Plaintiff has satisfactorily established this element of his *prima facie* case, and, to the extent that the Defendant seeks summary judgment on the ground that the Plaintiff failed to establish an adverse employment action, its motion is denied.

## ii.      Inference of Discrimination

Next, the Defendant contends that, even assuming that the Plaintiff suffered an adverse employment action, he failed to establish circumstances giving rise to an inference of discrimination. Again the Court disagrees.

### (A)      The Applicable Legal Principles

The Plaintiff can raise an inference of age discrimination by showing that he was: (1) similarly situated to other younger employees; and (2) treated less favorably than those employees. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015).

This comparative method requires only that the Plaintiff and his chosen comparators are "similarly situated in all material respects." *Johnson v. Andy Frain Servs.*, 638 F. App'x 68, 70 (2d Cir. 2016) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). "Those 'material respects' will 'var[y] somewhat from case to case,' " *Ehrbar*, 131 F. Supp. 3d at 21 (quoting *Ruiz v. County of*

*Rockland*, 609 F.3d 468, 493-94 (2d Cir. 2010)), but generally, "[t]he employees' positions, job responsibilities, and reporting structures are relevant," *id.* at 21-22 (collecting cases).

"In sum, there should be an 'objectively identifiable basis for comparability.'" *Id.* at 22 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)). And, "[b]ecause the inquiry is so fact-specific, 'whether two employees are similarly situated ordinarily presents a question of fact for the jury.'" *Id.* (quoting *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 54 (2d Cir. 2014)) (quoting, in turn, *Graham*, 230 F.3d at 39).

Further, "comments by employers or supervisors regarding a plaintiff's age can provide a sufficient basis for an inference of discrimination." *See Szewczyk v. City of New York*, No. 15-cv-918, 2016 U.S. Dist. LEXIS 91856, at *29-*30 (E.D.N.Y. July 14, 2016) (citing cases). In evaluating whether allegedly ageist remarks are probative of discriminatory intent, courts look to the same four analytical factors described above, namely, "(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Id.* at *16 (citing four factors from *Henry*, 616 F.3d at 149, and noting that "[r]emarks made by coworkers may also be probative of discriminatory intent, depending on the particular circumstances under which the comments were made").

Finally, the Plaintiff may raise an inference of discrimination by showing that he was replaced by a younger individual. *See Francis v. Elmford Sch. Dist.*, 263 F. App'x 175, 177 (2d Cir. 2008) (citing *D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007)); *Testa v. Carefusion*, No. 14-cv-5202, 2016 U.S. Dist. LEXIS 101204, at *12 (E.D.N.Y. Aug. 2, 2016).

In this regard, the Supreme Court has cautioned against overreliance on a replacement's membership in the protected group. Rather, the actual ages of those involved is a far more reliable indicator of discrimination than which side of 40 they happen to fall:

> The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 636(a). This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.* Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year old is replaced by a 40-year-old.

*O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996).

In applying these standards, the Court may rely on any combination of the relevant circumstances to conclude that an inference of discrimination has been established. *See Testa*, 2016 U.S. Dist. LEXIS 101204, at *16-*18 (collecting cases).

### (B) Application to the Facts of this Case

For many of the same reasons already discussed, the Court finds that questions of fact precluding summary judgment exist with regard to whether the complained-of employment actions occurred under circumstances giving rise to an inference of discrimination.

First, the Plaintiff persuasively asserts a theory of disparate treatment, namely, that younger external wholesalers were treated more favorably than he was. In this regard, there is uncontroverted evidence that, for three years in a row, from 2011 to 2014, substantial portions of the Plaintiff's sales territory were reassigned to Jared Larson, age 25, and Marhsall Birkins, age 32.

It is apparently true that the Defendant regularly reconfigured the boundary lines of its sales territories to account for expansion. It is also apparently true that every external wholesaler, at one point or another, saw the geographic scope of his or her sales territory decrease. However, in the Court's view, the totality of the evidence, when viewed in the light most favorable to the Plaintiff, presents a factual issue regarding whether the Plaintiff's territory was, as he claims, reduced more

than similarly-situated younger salespeople, or whether the boundary lines of his territory were selectively redrawn so as to excise regions that are fertile grounds for selling securities, such as the five boroughs of New York City.

There is also evidence that Andrew Kennedy, the internal wholesaler who had been hired specifically to provide sales support to the Plaintiff, was reassigned to Birkins, who, at 20 years his junior, was given responsibility for portions of the Plaintiff's former sales territory in Pennsylvania.

The record shows that, during the ensuing 11 months, while the Plaintiff was denied full-time internal support, the Defendant hired ten new internal wholesalers and eight sales associates. In the Court's view, a reasonable inference of discrimination may be drawn from the undisputed fact that, during this same time, no less than nine individuals with substantially the same job title and responsibilities as the Plaintiff, but who were under the age of 40, had a specifically assigned internal wholesaler assisting them.

Second, as discussed above, the Plaintiff has produced evidence that he and his job performance were the subject of remarks indicating age bias by managers, some of whom also exercised control and decision-making authority over the challenged aspects of his employment.

The Defendant argues that any inference of discrimination is precluded by the fact that many of the individuals who allegedly made these remarks were also over the age of 40, and therefore in the protected group, during the relevant time period. However, it is well-settled that, although " 'an allegation that a decision is motivated by age animus is weakened when the decisionmakers are members of the protected class,' " that factor is not dispositive. *Ehrbar*, 131 F. Supp. 3d at 25-26 (collecting cases).

Third, in addition to the reassignment of sales territory to younger salesmen described above, the undisputed evidence shows that, upon his resignation, approximately 20% of his remaining sales territory was reassigned to Aaron Bateman, who, at 37 years old, was sufficiently younger than the Plaintiff to support an inference of discrimination.

Viewing the record in the light most favorable to the Plaintiff, the Court finds that a reasonable juror evaluating these circumstances cumulatively could logically infer that they give rise to an inference of age discrimination. Accordingly, the Court finds that the Plaintiff has satisfactorily established a *prima facie* case, thereby shifting the burden of proof to the Defendant to demonstrate legitimate, non-discriminatory reasons for its alleged adverse employment action.

### b. Legitimate, Non-Discriminatory Reasons

The Defendant has carried its light burden of articulating an explanation for the challenged employment actions which, if true, would demonstrate lawful behavior.

Namely, the Defendant explained that the modifications to the Plaintiff's sales territory resulted from the company's growth and the concomitant need for additional external wholesalers in the field selling the company's products. In this regard, the Defendant asserted that, during the relevant time period, every external wholesaler, regardless of age, was displaced from some part of his or her former sales territory.

The Defendant also produced evidence that a simultaneous reduction in sales territory and increase in sales goals was implemented firm-wide, irrespective of the age of the salespeople involved. In this regard, there was testimony that the same age-neutral process used to determine the Plaintiff's annual sales goals was used for every other external wholesaler, taking into account the company's overall goals and the unique composition of the territories.

As to the Plaintiff's complaints about a lack of internal support staff, the Defendant asserted that every external wholesaler went some period of time without a full-time internal wholesaler assisting them, and that a full-time replacement was not provided to the Plaintiff because the company lacked enough internal support staffers to go around. In this regard, the Defendant's witnesses described a rigorous evaluation process for prospective internal wholesalers and sales associates, which caused delays in meeting hiring demands despite the company's best efforts to move around resources to satisfy the needs of all of its external wholesalers.

Finally, the Defendant provided age-neutral explanations for the Plaintiff's omission from the Commonwealth conference in Utah and the listing event in New York. Namely, there was testimony that, although the Plaintiff ranked in the top 10 in sales to Commonwealth and oversaw a sales territory that included the fifth-most Commonwealth representatives, there was no guarantee that his metro New York-based clients were likely attend the conference in Utah. Also, testimonial and documentary evidence suggests that limitations on space prevented the Defendant from inviting the Plaintiff to the formal bell-ringing ceremony commemorating the listing of FSIC.

In the Court's view, these explanations are sufficient to shift the burden back to the Plaintiff to establish that those reasons were actually a pretext for age discrimination.

### c.   Pretext

As noted above, the Plaintiff's burden at the final stage of the *McDonnell Douglas* test is to set forth evidence that, taken in his favor, raises a question of fact regarding whether his age was a "but for" cause of the Defendant's challenged conduct. *See Gross*, 557 U.S. at 180. However, importantly, "[t]hat age was a 'but for' cause does not mean 'that age was the employers [*sic*] *only consideration*, but rather that the adverse employment action *would not have occurred without it*." *Ehrbar*, 131 F. Supp. 3d at 20 (emphasis in original) (quoting *Delaney*, 766 F.3d at 169).

The burden of establishing pretext is higher than that required to establish a *prima facie* case of discrimination. *See John v. Kingsbrook Jewish Med. Ctr.*, No. 11-cv-3624, 2014 U.S. Dist. LEXIS 39322, at *51-*52 (E.D.N.Y. Mar. 25, 2014), *aff'd*, 598 F. App'x 798 (2d Cir. 2015).

Nevertheless, it is well-settled that a discrimination plaintiff may rely on the same evidence to establish pretext as he used to support his *prima facie* case. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 402 (2d Cir. 1998); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence or by reliance on the evidence comprising the *prima*

*facie* case, without more") (internal quotation marks and citations omitted); *Beirne v. Fieldcrest Cannon*, No. 92-cv-3282, 1997 U.S. Dist. LEXIS 4862, at *17-*18 (S.D.N.Y. Apr. 16, 1997) ("Where, as here, a plaintiff has established his *prima facie* case through evidence that the [adverse employment actions] occurred in circumstances giving rise to an inference of discrimination, the plaintiff is permitted to rely on the same evidence to demonstrate pretext").

In fact, " 'unless the employer has come forward with evidence of a *dispositive* nondiscriminatory reason[ ] as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.' " *Id.* at *18 (emphasis in original) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

Indeed, the Supreme Court has held that, because the defendant's burden at the second stage of the *McDonnell Douglas* test is not to "persuade the court that it was actually motivated by the proffered [non-discriminatory] reasons," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S. Ct. 1089, 67 L. Ed. 207 (1981), "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the *prima facie* case, suffice to show intentional discrimination," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

In this case, construing the record in the light most favorable to the Plaintiff, the Court finds that there is a sufficient evidentiary basis, as outlined above, for a reasonable trier of fact to doubt the Defendant's explanation and ultimately find that age bias was the true reason behind the employment decisions relating to the Plaintiff.

In reaching this conclusion, the Court observes that, while perfectly reasonable on their face, the Defendant's explanations for the alleged adverse employment actions are not dispositive on the issue of discriminatory intent.

Without belaboring the point, the Court notes that questions of fact precluding summary judgment exist as to whether, although all of the external wholesalers' territories ultimately changed, the Plaintiff's territory changed in unfair or disproportionate ways to allow younger salespeople to encroach on his clients.

There are also issues of fact as to whether the Defendant actually lacked the resources to replace the Plaintiff's internal wholesaler, or whether those resources were intentionally diverted to younger external wholesalers to assist them in matching their increased sales goals while impeding the Plaintiff's ability to match his goals.

The same is true of the Defendant's decision not to select the Plaintiff for attendance at desirable and potentially lucrative offsite conferences, such as the listing event in New York. Although the Defendant's witnesses cited the Plaintiff's ineptitude at public speaking and other age-neutral reasons for his exclusion, a rational jury could logically find that, given the Plaintiff's experience servicing the New York market and his role in raising substantial portions of the assets of the fund in question, he would have been considered suitable to attend but for his age.

This is particularly true in light of the alleged ageist remarks by the Plaintiff's superiors, which, if true, may cause seemingly trivial workplace slights to bear a more ominous significance.

Nor is it dispositive, as the Defendant suggests, that the company employed external wholesalers who were older than the Plaintiff, but nevertheless experienced similar modifications in the terms and conditions of their employment as the company grew. As the court found in *Beirne*, *supra*, while such data may show that the "overall impact" of the Defendant's expansion "did not have a discriminatory impact on the protected class as a whole," it does not "eliminate the possibility that the Plaintiff[ ], individually, [was] discriminated against on the basis of age." 1997 U.S. Dist. LEXIS 4862, at *19.

In sum, the Court finds that the Plaintiff has sustained his burden of showing that triable issues of fact exist with regard to whether he was subjected to unlawful age discrimination.

Accordingly, to the extent that it seeks to dismiss the Plaintiff's claims based on age discrimination under the ADEA, the NYSHRL, and the NYCHRL, the Defendant's motion for summary judgment is denied.

## C.    The Plaintiff's Claims of Retaliation

The Plaintiff also brings claims of retaliation under the ADEA, the NYSHRL, and the NYCHRL. In particular, the Plaintiff claims that: (1) the Defendant deprived him of internal sales support from July 2013 to June 2014 and excluded him from the April 16, 2014 listing event in New York City; and (2) that these decisions were retaliation for lodging informal complaints of unfair treatment; retaining counsel in connection with allegations of unlawful discrimination; and eventually filing a charge of discrimination with the EEOC.

For the reasons that follow, the Defendant's motion for summary judgment dismissing these claims is also denied.

### I.    The Applicable Legal Framework

"The ADEA, the NYSHRL, and the NYCHRL prohibit retaliation against employees for opposing employment practices that unlawfully discriminate on the basis of age," and "[c]ourts apply the *McDonnell Douglas* framework to all three analyses." *Digilov v. JPMorgan Chase Bank, N.A.*, No. 13-cv-975, 2015 U.S. Dist. LEXIS 19370, at *47-*48 (S.D.N.Y. Feb. 18, 2015).

At first, this entails a *prima facie* showing that: (1) the Plaintiff engaged in a protected activity; (2) the Defendant was aware of that activity; (3) the Plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Sengillo v. Valeo Elec. Sys.*, 328 F. App'x 39, 40-41 (2d Cir. 2009).

As to the fourth element, the Second Circuit "has consistently held that proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

The Plaintiff's burden at this stage is again *de minimis*. *See Ehrbar*, 131 F. Supp. 3d at 32.

"If the plaintiff satisfies this burden, 'then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory.'" *Id.* (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010)).

Finally, if the Defendant articulates legitimate, non-retaliatory reasons for its employment decisions, "the presumption of retaliation dissipates," *id.*, and "the burden shifts back to the Plaintiff to show that retaliation was a but-for cause of the adverse employment action," *Colandrea v. Hunter-Tannersville Cent. Sch. Dist.*, No. 15-cv-456, 2017 U.S. Dist. LEXIS 41551, at *28 (N.D.N.Y. Mar. 22, 2017).

In doing so, the Plaintiff "may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (citing cases).

2.      **Application to the Facts of this Case**

a.      *Prima Facie* **Case of Retaliation**

For purposes of this motion, the Defendant does not materially dispute the first three elements of the Plaintiff's *prima facie* case. In any event, the Court finds that there is sufficient evidence in the record to sustain the Plaintiff's minimal burden of showing that he engaged in a protected activity known to the Defendant, namely, lodging formal and informal complaints; and suffered the adverse employment actions discussed above.

However, the Defendant contends that the Plaintiff has not established a causal connection between his protected activities and the challenged employment actions. Again the Court disagrees.

On the contrary, the Court finds that a reasonable inference of retaliation may be drawn from the temporal proximity between the events in question, coupled with statements directed against the Plaintiff by Wolfe and others, evidencing a retaliatory animus.

In this regard, the Plaintiff testified that he began complaining about discriminatory reductions in the geographic scope of his sales territory in late-2012, when he reported to Adrienne Hart that he believed he was being treated unfairly because of his age. By that time, the Plaintiff had already experienced two territorial modifications, both of which resulted in the reallocation of portions of his territory to significantly younger salespeople. Wolfe and Murphy, who were undisputedly involved in these decisions, also acknowledged fielding complaints from the Plaintiff, although the timing of these complaints remains unclear.

In any event, approximately seven months later, in July 2013, the Defendant reassigned Andrew Kennedy away from the Plaintiff, which, according to the Plaintiff, exacerbated the already-untenable situation caused by simultaneous increases in his sales goals and decreases in sales territory.

Although, as a general matter, "district courts in this circuit have found that a lapse in time greater than two months is insufficient to make out a *prima facie* retaliation case," *Harcourt Leacock v. Nassau Health Care Corp.*, No. 08-cv-2401, 2013 U.S. Dist. LEXIS 129736, at *30 (E.D.N.Y. Sept. 11, 2013), the Court finds that, under the facts and circumstances of this case, the seven-month gap between the Plaintiff's complaints and the alleged adverse employment action is not dispositive on the issue of retaliatory intent.

Rather, this gap must be viewed in the context of the entire record, which, when taken in the Plaintiff's favor, further reveals that, between July 2013 and June 2014, a series of relevant events,

punctuated by comments clearly indicating a retaliatory motive, occurred in sufficiently close succession to support a reasonable inference of unlawful retaliation.

In particular, after the July 2013 staffing change, the Plaintiff continued complaining "often" that he lacked adequate internal sales support – a condition which, as noted above, Wolfe agreed would have impacted the Plaintiff's ability to effectively perform his job.

However, just two months later, in September 2013, Wolfe allegedly told the Plaintiff that he would be naïve to think that the delay in replacing his internal support staff was unrelated to his frequent complaints. Crediting the Plaintiff's version of events, this sentiment was repeated by Wolfe several months later, when in January 2014, Wolfe again indicated that the Plaintiff was being punished for leveling complaints against the company.

Thereafter, on February 3, 2014, the Plaintiff took another protected action by causing his attorney to send a letter to Wolfe outlining his allegations of discriminatory and retaliatory conduct on the part of the Defendant. On March 27, 2014, he filed a formal charge of discrimination with the EEOC.

That same month, when he inquired as to the status of a replacement for Kennedy, Shaun Adams advised the Plaintiff that he was "in the penalty box" – a sentiment that is consistent with the Plaintiff's account of being shunned at the company meeting at Wolfe's home.

The following month, Wolfe advised him in a "short, curt" way that, despite his request, he "would not be attending" the April 16, 2014 listing event in New York City. He resigned approximately two months later.

In the Court's view, this sequence of events, if believed, would support a reasonable inference that the Defendant's decision to reassign and not replace the Plaintiff's internal wholesaler, as well as its decision not to select the Plaintiff for attendance at an important company event in New York, were causally connected to the Plaintiff's repeated formal and informal complaints regarding his belief that he was being treated unfairly as a result of unlawful age discrimination. *See*

*Harcourt Leacock*, 2013 U.S. Dist. LEXIS 129736, at *34-*35 (finding that a nearly year-long period between the plaintiff's complaint of discrimination and her termination, when taken together with a threatening remark by a supervisor, was sufficient to defeat summary judgment).

Accordingly, the Court finds that the Plaintiff has satisfied his minimal burden of establishing a *prima facie* case of retaliation, thereby shifting the burden to the Defendant to articulate legitimate, non-retaliatory reasons for their adverse employment actions.

### b.    Legitimate, Non-Retaliatory Reasons

For the same reasons as outlined above, the Court finds that the Defendant has sufficiently articulated a non-retaliatory explanation for the complained-of conduct. Thus, again, the burden shifts back to the Plaintiff to establish that those reasons were actually a pretext for unlawful retaliation.

### c.    Pretext

Here, again, the Court invokes the principle, discussed above, that the Plaintiff may use the same evidence to establish pretext as he used to support his *prima facie* case.

Thus, for substantially the same reasons set forth above, the Court again finds that the evidence, when construed in the light most favorable to the Plaintiff, is sufficient to warrant a denial of summary judgment as to retaliation.

In particular, the totality of the circumstances – including the temporal proximity between the protected activities and the allegedly retaliatory treatment, as well as the remarks by Wolfe and Adams evincing a retaliatory motive – is such that a reasonable trier of fact could conclude, by a fair preponderance of the evidence, that notwithstanding the non-retaliatory reasons proffered by the Defendant, the Plaintiff would not have been terminated if not for his earlier complaints of age bias.

This is particularly true given that the Defendant's explanations for the challenged employment decisions do not conclusively eliminate relevant questions of material fact.

In this regard, the Court again notes that an apparent contradiction exists between the Defendant's position that it lacked sufficient internal support staff to accommodate the Plaintiff, and the fact that it nevertheless hired multiple internal wholesalers and sales associates to assist younger salespeople.

There is also an apparent conflict in the Defendant's explanation as it relates to selecting attendees for conferences. Namely, with regard to the Commonwealth conference in Utah, the Defendant's witnesses testified that, among the factors considered in selecting John Cardillo to attend were: (1) a regional connection between the event's sponsor and Cardillo's sales territory; (2) the number and composition of clients likely to be in attendance; and (3) the amount of sales generated by Cardillo in the geographic region where the conference was held.

However, viewing the evidence in the light most favorable to the Plaintiff, when it came to staffing the listing event in New York City, these same factors would appear to favor the Plaintiff's attendance. Yet, citing "space and other constraints," the Defendant – allegedly unceremoniously – omitted him from the guest list. Under these circumstances, the Court finds that a rational jury would be justified in concluding that, but for the Plaintiff's complaints of discrimination immediately preceding this event, he would have been asked to attend and reap any associated benefits.

Therefore, the Court again finds that the Plaintiff has sustained his burden of showing that triable issues of fact exist with regard to whether he was retaliated against for engaging in protected activity under the ADEA and its state and local counterparts. Accordingly, to the extent that it seeks to dismiss the Plaintiff's claims based on retaliation under the ADEA, the NYSHRL, and the NYCHRL, the Defendant's motion for summary judgment is denied.

### III.    Conclusion

Based on the foregoing, the Defendant's motion for summary judgment is denied in its entirety.  This matter is recommitted to United States Magistrate Judge A. Kathleen Tomlinson for the completion of discovery.

It is **SO ORDERED.**

Dated:  Central Islip, New York
         May 18, 2017

/s/ Arthur D. Spatt
ARTHUR D. SPATT
United States District Judge